**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **PENSION BENEFIT GUARANTY CORPORATION,** | ) ) ) | **CASE NO.  1: 11 CV 1961** |
| Plaintiff, | ) ) | **JUDGE PATRICIA A. GAUGHAN** |
| vs. | ) ) | |
| **BENDIX COMMERCIAL VEHICLE SYSTEMS, LLC,** | ) ) ) | **Memorandum of Opinion and Order** |
| Defendant. | ) | |

This action arises under Title IV of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1301-1461 (ERISA).  Plaintiff Pension Benefit Guaranty Corporation (PBGC), a United States government agency, brings this action to collect $16,637,695.00 from Defendant Bendix Commercial Vehicle Systems LLC (Bendix) pursuant to § 1362(e) of ERISA.  PBGC issued an administrative decision finding Bendix liable for this amount under § 1362(e) as a result of Bendix's closing of its plant in Frankfort, Kentucky.

Bendix has moved for discovery in the case (Doc. 21).  For the reasons stated below,

1

the motion for discovery is denied.

**Background**

PBGC is a wholly owned United States government corporation established under 29 U.S.C. § 1302(a) to administer and enforce the provisions of the mandatory pension plan termination and insurance program established in Title IV of ERISA. Bendix maintains a pension plan for hourly employees (the Plan) that is covered by the pension plan termination insurance program. When an underfunded plan terminates without sufficient assets to pay its liabilities, PBGC uses its insurance funds to pay guaranteed benefits to participants and beneficiaries over their lifetimes subject to the limits set by Title IV.

On December 31, 2007, Bendix ceased operations at its manufacturing facility in Frankfort, Kentucky. As a result, all of the 63 Bendix employees who worked at the Frankfort facility were separated from their employment with Bendix. As required by law, Bendix reported this closure to PBGC on January 30, 2008. On January 29, 2010, PBGC issued an initial determination letter, notifying Bendix that the cessation of its operations at the Frankfort facility subjected Bendix to liability under 29 U.S.C. §§1362(e) and 1363 of ERISA.

Section 1362(e) of ERISA provides that if an employer ceases operations at a facility in any location and as a result of such cessation of operations more than 20 percent of the total number of his employees who are participants under a plan established and maintained by him are separated from employment, the employer is treated as a "substantial employer" of a multiple employer plan and is subject to the withdrawal liability provisions set forth in §

1363.[1] Section 1363(b) pertains to the computation of liability when a substantial employer withdraws from a multiple employer plan and provides that the plan's unfunded benefit liabilities to the withdrawing employer are allocated based on the ratio of the employer's required contributions for the five years before withdrawal.

Specifically, 29 U.S.C. § 1363(b) states:

(b) Computation of liability

Except as provided in subsection (c) of this section, any one or more contributing sponsors who withdraw, during a plan year for which they constitute a substantial employer, from a single-employer plan which has two or more contributing sponsors at least two of whom are not under common control, shall, upon notification of such contributing sponsors by the corporation as provided by subsection (a) of this section, be liable, together with the members of their controlled groups, to the corporation in accordance with the provisions of section 1362 of this title and this section. The amount of liability shall be computed on the basis of an amount determined by the corporation to be the amount described in section 1362 of this title for the entire plan, as if the plan had been terminated by the corporation on the date of the withdrawal referred to in subsection (a)(1) of this section, multiplied by a fraction–

> **(1)** the numerator of which is the total amount required to be contributed to the plan by such contributing sponsors for the last 5 years ending prior to the withdrawal, and

---

[1]Section 1362(e) provides:

(e) Treatment of substantial cessation of operations
If an employer ceases operations at a facility in any location and, as a result of such cessation of operations, more than 20 percent of the total number of his employees who are participants under a plan established and maintained by him are separated from employment, the employer shall be treated with respect to that plan as if he were a substantial employer under a plan under which more than one employer makes contributions and the provisions of sections 1363, 1364 and 1365 of this title shall apply.

(Sections 1364 and 1365 do not apply here– Section 1364 pertains to termination of multiple employer plans, and Section 1365 pertains to the filing of annual reports.)

>> **(2)** the denominator of which is the total amount required to be contributed to the plan by all contributing sponsors for such last 5 years.
>
> In addition to and in lieu of the manner prescribed in the preceding sentence, the corporation may also determine such liability on any other equitable basis prescribed by the corporation in regulations. Any amount collected by the corporation under this subsection shall be held in escrow subject to disposition in accordance with the provisions of paragraphs (2) and (3) of subsection (c) of this section.

On June 16, 2006, pursuant to the authority statutorily delegated to it to determine liability "on any other equitable basis," PBGC published a final rule for computing liability under § 1363(b) when an employer experiences an event triggering liability under § 1362(e). Pursuant to 29 C.F.R. § 4062.8, liability under § 1362(e) is determined by multiplying the plan's unfunded benefit liabilities under § 1362(b) as if the plan were terminated immediately after the date of the cessation of operations by a fraction according to a "headcount formula." The numerator of the fraction is the number of active plan participants who were separated from employment as a result of the cessation; the denominator is the total number of the participants in the plan immediately before the cessation. The regulation provides:

> (a) Liability amount. If, pursuant to section 4062(e) of ERISA, an employer ceases operations at a facility in any location and, as a result of such cessation of operations, more than 20% of the total number of the employer's employees who are participants under a plan established and maintained by the employer are separated from employment, the PBGC will determine the amount of liability under section 4063(b) of ERISA to be the amount described in section 4062 of ERISA for the entire plan, as if the plan had been terminated by the PBGC immediately after the date of the cessation of operations, multiplied by a fraction–
>
>> (1) The numerator of which is the number of the employer's employees who are participants under the plan and are separated from employment as a result of the cessation of operations; and
>>
>> (2) The denominator of which is the total number of the

>> employer's current employees, as determined immediately
>> before the cessation of operations, who are participants under
>> the plan.

29 C.F.R. § 4062.8.

The employer may satisfy the liability by having PBGC hold the liability amount in escrow or by providing PBGC with a surety bond in an amount not to exceed 150% of the liability.  29 U.S.C. § 1363(b), (c).  If the plan does not terminate within five years, the liability is abated and any payments held in escrow are refunded without interest or the bond is cancelled.  29 U.S.C. § 1363(c)(2).  Bendix's five year period ends on December 31, 2012.  In its initial determination, PBGC calculated Bendix's unfunded benefit liabilities as of the date of the cessation of Bendix's operations (December 31, 2007) to be $16,947,933.  PBGC indicated that Bendix should provide a bond for the liability amount or escrow.

Bendix indicated that it would appeal PBGC's determination and asked PBGC to provide to it PBGC's liability calculations and an explanation of and documentation supporting PBGC's liability determination.

Bendix filed its appeal with the PBGC Appeals Board on June 30, 2010.  In its appeal, Bendix disputed that it was liable under § 1362(e) and contested PBGC's determination of its liability.  Bendix raised three arguments on appeal:  (1) Bendix has no liability under § 1362(e) because the Plan was a "successor plan" to a predecessor plan that Bendix did not establish; therefore, the Plan was not "established and maintained" by Bendix; (2) the liability formula used by PBGC established in 29 C.F.R. § 4062.8 was contrary to law in that it violated statutory mandates; and (3) PBGC failed to properly calculate the Plan's unfunded benefit liabilities under the liability formula even if the regulation was not contrary to law.

On March 4, 2011, Bendix filed an appeal supplement based on documents that PBGC belatedly disclosed to Bendix.  Bendix argued in its appeal supplement that:  (1) belatedly-disclosed actuarial information confirms the deficiencies Bendix argued in its original appeal; (2) belatedly-disclosed actuarial information reveals the existence of significant errors which confirm that, even if PBGC is permitted to estimate rather than determine the amount of Bendix's liability, its estimates are flawed; and (3) the Appeals Board should determine whether PBGC has any other relevant documents and either provide them to Bendix or confirm that none exist.

On August 8, 2011, the PBGC Appeal Board issued a 31 page final agency decision, considering Bendix's arguments and determining Bendix to be liable under 29 U.S.C. § 1362(e) for $16,637,695, about $300,000 less than the amount stated in PBGC's initial determination.  In reaching its final determination, the Appeal Board rejected the bulk of Bendix's arguments on appeal.  First, the Appeal Board rejected Bendix's argument that Bendix did not "establish and maintain" the Plan.  Second, the Appeal Board rejected Bendix's argument that the liability formula set forth in PBGC's regulation is invalid or unreasonable.  With respect to this argument, the Appeal Board concluded that it did not have authority to review the validity or reasonableness of the regulation, which was promulgated after notice and comment rulemaking.  With respect to Bendix's third argument that PBGC incorrectly calculated Bendix's unfunded benefit liability, the Appeals Board agreed with Bendix that liability should be calculated as of January 1, 2008, immediately after the § 1362(e) event, rather than as of December 31, 2007.  In addition, the Appeal Board agreed with Bendix that it was appropriate to use actuarial information contained in the Plan's 2008

actuarial report.[2]  As a result of these determinations by the Appeal Board, the Appeal Board recalculated Bendix's liability, which resulted in the reduction of Bendix's liability to $16,637,695.

PBGC filed this lawsuit on September 16, 2011, to enforce the Appeal Board's decision.  PBGC seeks to recover from Bendix an escrow in the amount of $16,637,695 under 29 U.S.C. § 1362(e).

Bendix denies that it is liable under 29 U.S.C. § 1362(e) for essentially the same reasons it asserted in its appeal to the PBGC Appeal Board.  (*See* Bendix Amended Answer.) Bendix contends:  it did not "establish and maintain" the Plan within the meaning of 29 U.S.C. § 1362(e); the regulation promulgated by PBGC, 29 C.F.R. § 4062.8, "is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law; and is in excess of statutory jurisdiction, authority, or limitations or short of statutory right"; PBGC's findings as to the amount of Bendix's liability fail to comply with PBGC's own regulation; any liability Bendix has under 29 U.S.C. § 1362(e) must be offset by amounts Bendix has paid into the Plan in excess of legally required amounts; and PBGC arbitrarily and capriciously failed to consider whether and to what extent Bendix posed a risk to PBGC or the Plan.

**Standard of Review**

The parties agree this case is governed by the Administrative Procedure Act, 5 U.S.C.

---

[2] The Appeal Board rejected Bendix's argument that PBGC must perform participant-by-participant calculations of the Plan's liabilities (instead of calculating § 1362(e) liability based on an actuarial *estimate* of unfunded benefit liabilities).  In addition, the Appeal Board rejected Bendix's argument that the value of certain contingent claims against Bendix should be credited to the Plan's assets to reduce the § 1362(e) liability.

§ 551 *et seq*. (the APA).  The APA authorizes a reviewing court to hold unlawful or set aside agency action, findings, and conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance law" or if action actions fails to meet statutory, procedural, or constitutional requirements.  5 U.S.C. § 706(2)(A)-(D).  In an APA action, it is well settled that:

> 'The focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.' *Camp v. Pitts*, 411 U.S. 138, 142, 93 S. Ct. 1241, 36 L.Ed.2d 106 (1973).  The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court.  *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S. Ct. 814, 28 L.Ed.2d 136 (1971).
>
> If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.

*Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985).  Thus, "[d]iscovery is rarely proper in the judicial review of administrative action."  *USA Group Loan Services, Inc. v. Riley*, 82 F.3d 708, 715 (7th Cir. 1996).  The Sixth Circuit has acknowledged some circumstances that would justify departure from the general rule, stating that "supplementation of the administrative record" is justified "when an agency deliberately or negligently excludes certain documents, or when the court needs certain "'background information' in order to determine whether the agency considered all of the relevant factors." *Sierra Club v. Slater*, 120 F.3d 623, 638 (6th Cir. 1997).  In addition, "in order to justify supplementation, a plaintiff must make a "'strong showing' of bad faith." *Id*.

**Discussion**

Bendix seeks discovery as to three matters.  First, Bendix seeks discovery "to confirm" that PBGC produced to Bendix all relevant documents during the pendency of the administrative proceeding.  Bendix asserts that PBGC provided Bendix with documents during the administrative proceeding in a "piecemeal" and "delayed" fashion and refused to confirm to Bendix that it had produced all of the documents relevant to its liability determination.  Bendix asserts that PBGC's "piecemeal and potentially incomplete production of relevant records may hinder the Court from making an informed decision," and Bendix asserts that "it is entitled to discovery to test the integrity and completeness of the administrative record, including the production of a privilege log describing any relevant documents that are being withheld."  (Br. at 9.)

Second, Bendix seeks discovery regarding aspects of the liability formula promulgated by PBGC in 29 C.F.R. § 4062.8.  Bendix contends the liability formula promulgated in the regulation is arbitrary and capricious and fails to meet statutory mandates because it is not an equitable method for determining liability under § 1362(e) but instead "stacks the deck" to maximize liability in a manner that is both inequitable and inconsistent with the statutory "proportionality principals" underlying Section 1363 of ERISA.  (Br. at 11-12.)  Bendix's asserted basis for discovery is that "the Court will best be able to determine whether the PBGC's downsizing liability formula is arbitrary and capricious if it reviews information not contained in the administrative record."  (Br. at 9.)  Bendix seeks discovery regarding the impact of PBGC's liability formula "on the regulated community" in other "real world" downsizing liability cases.[3]  (Br. at 12.)  Bendix contends this discovery will assist the Court

---

[3] The discovery Bendix seeks in other downsizing cases includes discovery as to:

in determining whether the liability formula complies with statutory mandates that the formula be equitable and in accordance with proportionality principals embodied in § 1363 of ERISA.  In addition, Bendix seeks discovery as to PBGC's "valuation methodology and assumptions" underlying its liability formula.  Bendix contends this discovery is necessary in order "to determine whether [the valuation methodology and assumptions] produce arbitrary and capricious results."  (Br. at 13.)  Bendix explains:

> PBGC's valuation assumptions are intended to replicate the market price of pension annuities sold by insurance companies.  To calibrate interest factors, the PBGC uses two American Council of Life Insurers (ACLI) quarterly surveys regarding annuity prices.  According to PBGC, when ACLI receives the surveys, it removes any information that could identify the responding company and then forwards the pricing information to the PBGC.  The ACLI does not inform the PBGC of how many or which annuity providers received the survey or which responded.
>
> Bendix submits that it is critical that it be permitted to conduct discovery regarding PBGC's valuation methodology and assumptions, including to determine whether the survey can be reasonably relied on for purposes of establishing the key interest rate factors used by PBGC to determine the value of its claim. . . .  Key questions include:
>
> • How many insurance companies nationwide offer pension annuities for terminating plans and what is their approximate share of that annuity market?  (This information is essential for assessing the validity of the survey.)
>
> • Of these insurance companies, how may participated in the ACLI surveys relied upon by PBGC to determine the interest rate applicable to the $17 million claim PBGC asserts against Bendix? . . .

---

what percentage of the total number of participants in the pension plan, and of the overall workforce of the employer, was affected by the downsizing event; what percentage of the total plan liabilities was attributable to the participants affected by the downsizing event; what percentage of the total plan liabilities was attributable to the facility that ceased operations; what percentage of the employer's revenues was attributable to the facility that ceased operations; what percentage of the employer's required contributions were attributable to liabilities associated with the facility that ceased operations.

10

  • Were the annuity prices provided to the ACLI "asked for" prices or final prices? . . .

  • To what extent are the survey prices relevant to annuity prices for larger plans?

(Br. at 13-14.)

Third, Bendix asserts that it is entitled to discovery "regarding whether and to what extent PBGC considered the issue of risk (a) in seeking to impose downsizing liability on Bendix, (b) in the downsizing liability cases the agency has opened since the liability formula has been in effect, and (c) in the downsizing liability cases the agency has settled since the liability formula has been in effect." Bendix contends it is entitled to this discovery in light of an October 2011, article that quoted PBGC Director, Joshua Gotbaum, as expressing the view at a conference that downsizing liability should not be imposed if the plan sponsor does not pose a risk to PBGC.[4]

PBGC opposes Bendix's requests for discovery. PBGC argues that Bendix is not entitled to discovery outside of the administrative record because Bendix has not offered any "evidence" that the administrative record filed by PBGC excludes any documents.[5] This argument has merit. An agency is given a "strong presumption of regularity" in its submission and certification of the administrative record. *Hickey v. Chadick*, Case No. 2: 08

---

[4] Bendix contends it poses no risk of terminating without adequate funding and states that "the likely scenario if PBGC prevails in this action is that [PBGC] will hold the escrow for a period of months before being required to return it to Bendix (without interest)." (Rep. at 3, note 2.)

[5] PBGC asserts that it has filed the administrative record with its opposition. (Opp. at 10.)

11

CV 0824, 2009 WL 3064445, at * 2 (S.D. Ohio Sept. 18, 2009).  Thus, "[t]he court assumes the agency properly designated the Administrative Record absent clear evidence to the contrary."  *Id*.  Bendix's assertions that PBGC provided piecemeal, delayed  and "potentially" incomplete discovery that "may" hinder the Court from making an informed decision is not "clear evidence" that PBGC has not properly designated the administrative record in this case or has deliberately or negligently excluded documents.  The Court will not allow Bendix discovery for the purpose of "test[ing] the integrity and completeness" of the administrative record in that Bendix has not produced clear evidence that documents have been excluded.

PBGC contends Bendix is not entitled to discovery as to the impact on 29 C.F.R.§ 4062.8 in other cases because Bendix's challenges to PBGC's liability determination are legal challenges – in particular, Bendix contends the liability formula set forth in 29 C.F.R.§ 4062.8 is arbitrary and capricious and contrary to statutory mandates in ERISA.  PBGC contends the Court does not need discovery on the impact of 29 C.F.R.§ 4062.8 on other pension sponsors to make such a legal determination.  Rather, PBGC contends, "the Court's review of PBGC's determination is based on the administrative record and the two-part test established in *Chevron, USA Inc. v. NRDC*[, 467 U.S. 837, 843 (1984).]  (Opp. at 11.)  The Supreme Court explained in *Chevron* how a court should treat an agency's interpretation of a statute within the agency's ambit, holding that "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer."  *Id*. at 844.  The *Chevron* two-step test requires the court to ask "whether the statute is silent or ambiguous with respect to the specific issue before it; if so, the question for the court [is] whether the agency's answer is based on a permissible construction of the statute."  *Singh v. Gonzalez*,

12

451 F.3d 400, 403-04 (6th Cir. 2006).  PBGC contends *Chevron* deference is appropriate here because Congress delegated to PBGC the authority to enact regulations to determine liability under § 1363 of ERISA "on any other equitable basis," and PBGC promulgated 29 C.F.R. § 4062.8 after notice and comment rulemaking.  PBGC contends whether PBGC's regulation is a permissible construction of the statute can be determined without discovery on the basis of "the statute, the regulation, and the agency's explanation."  (Opp. at 13.)  Likewise, PBGC opposes discovery as to the methodology and assumptions underlying its regulation for valuing liabilities, asserting that whether its regulation for valuing liabilities "is an arbitrary and capricious interpretation of the statute is [also] a purely legal question for the Court to assess based on the statute, the regulation, and the agency's explanation."  (Opp. at 15.)

PBGC's arguments are persuasive that Bendix's challenges to PBGC's determination in its case involve legal determinations that may be made without discovery on the basis of the administrative record.  Bendix has not persuasively demonstrated that discovery outside the administrative record as to the impact of PBGC's liability formula in other real world downsizing cases and as to the "valuation methodology and assumptions" underlying PBGC's liability formula is justified or needed in order for the Court to determine whether PBGC's liability formula is arbitrary and capricious and inconsistent with statutory mandates.  Further, Bendix has not presented any case finding discovery needed in a similar context.  Accordingly, Bendix's request for discovery as to impact of PBGC's liability in other real world cases and as to the "valuation methodology and assumptions" underlying PBGC's liability formula is denied.

Finally, the Court agrees with PBGC that discovery is unnecessary as to whether and

to what extent PBGC considered risk in seeking to impose downsizing liability on Bendix and in other downsizing liability cases. As PBGC argues in its opposition brief, despite the comments of PBGC's director, liability under § 1362(e) of ERISA is not based on the risk presented by a plan sponsor. Furthermore, if Bendix believes PBGC's liability determination should be set aside because Bendix does not present any risk to PBGC, Bendix may assert that legal argument. No discovery is necessary for it to do so.

**Conclusion**

For all of the reasons discussed above, Bendix's motion for discovery is denied.

IT IS SO ORDERED.


    /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 2/24/12